UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____
                               )
UNITED STATES OF AMERICA,       )
                               ) Case No. 19-CR-04488-JLS
                Plaintiff,      )
                               ) Friday, December 12, 2025
v.                              )
                               ) Sentencing Hearing
VALORIE MOSER,                  )
                               )
                Defendant.      )
_____)


BEFORE THE HONORABLE JANIS L. SAMMARTINO

UNITED STATES DISTRICT JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

PAGES 1 THROUGH 41


APPEARANCES:

    For Plaintiff:   UNITED STATES ATTORNEY'S OFFICE
                     880 Front Street, Suite 6293
                     San Diego, California  92101-8807
                     BY:  ALEXANDRA FOSTER, AUSA
                     BY:  JOHN PARMLEY, AUSA

    For Defendant:   LAW OFFICE OF ANTHONY E. COLOMBO, JR.
                     105 West F Street, Floor 3
                     San Diego, California 92101-6036
                     BY:  ANTHONY COLOMBO, ESQ.


Reported By:  Stephanie Whitehead, RDR, CRR, CRC, CVR, CSR
District Court Clerk's Office
333 West Broadway, Suite 420, San Diego, California  92101
(Reported stenographically; transcribed via computer)

<u>FRIDAY, DECEMBER 12, 2025; 10:43 A.M.</u>

\*          \*          \*

*THE CLERK:*  Matter number six:  19-cr-4488, United States of America v. Valorie Moser for sentencing.

*MS. FOSTER:*  Good morning, your Honor.  Alexandra Foster and John Parmley for the United States.

*THE COURT:*  Thank you.  Good morning.

*MR. COLOMBO:*  Good morning, your Honor.  Anthony Colombo on behalf of Ms. Moser who is present on bond.

*THE COURT:*  Okay.  Thank you.

The Court has read and considered the following documents for sentencing this morning:  I have the presentence report; I have the addendum to the presentence report; I have defendant's sentencing summary chart; and I have defendant's sentencing memorandum with the letter from the therapist, brother, employer, friends, and the amicus brief attached.  I have the Government's sentencing memorandum, and I have some victim impact statements from the Government and underlying plea agreement.

Is that everything?

*MS. FOSTER:*  I think that's everything.

(Discussion between counsel.)

*MS. FOSTER:*  Your Honor, I think Mr. Colombo is asking whether --

*MR. COLOMBO:*  Did you say friends of the Court

amicus -- oh, the one that I filed?

*THE COURT:*  Your amicus brief that you filed.

*MR. COLOMBO:*  Okay.  Got it.  Yes, as an exhibit.

*THE COURT:*  The lengthy, lengthy, lengthy amicus that you filed, sir.

*MR. COLOMBO:*  Yes.

*THE COURT:*  You should know that you filed it, sir.

*MR. COLOMBO:*  Yes.

*THE COURT:*  So that's everything.  A couple of preliminary comments.  I mean, I'm going to follow the calculation that both the defense, the Government, probation all agree to up to the point where you disagree, which is on other matters which you are all aware of.

It's hard for me to give you a tentative.  Let me say this:  Probation's at 51 months.  The defense is asking for a probationary sentence, and the Government's asking for 24.  I think this is probably the last sentencing that I'll have in this overall case.  As I look at this, and I read on this, as I reflect on this, my feeling right now is that some custodial time is warranted in this matter, that it cannot -- should not be a straight probationary sentence.  And I just want to say that up front for you, Mr. Colombo.  I mean, I'm open-minded, but that's my -- would be my one tentative.

I'm certainly not where probation is.  I'm probably where the Government is, if we were looking at things right now.  So I understand what the victims say; that there were two victim statements attached, and I know that she didn't always have contact with the people who were being victimized in all of this, yet she did play a role in this, and not an insignificant role, for a period of about three and a half years I think.

So that's the best tentative I can give you, Mr. Colombo.  Go ahead, sir.  Tell me whatever you'd like to tell me.

MR. COLOMBO:  Thank you.  First, I think the period was significantly shorter than three and a half years.

THE COURT:  I'm sorry?

MR. COLOMBO:  I think the period was shorter than three and a half years.

THE COURT:  Well, I have March of 2015 to the fall of 2018.

MR. COLOMBO:  Okay.  Yeah, that --

THE COURT:  So I mean, that seemed to be a time frame that was agreed-upon.

MR. COLOMBO:  Yeah.

THE COURT:  That's where I get the three and a half years.

*MR. COLOMBO:* But I think within that context there's obviously a learning curve of what was actually going on at the time. It wasn't that when she joined and was hired as an employee that she was aware of the business practice. I mean, that was something that she came to learn later on after being employed there. But unfortunately didn't -- didn't report it immediately at that time.

But so I think, your Honor, first with regard to the guidelines before I address anything else, I think the parties are in agreement with the guidelines. The only dispute is in relation to the credit for substantial assistance.

*THE COURT:* Exactly.

*MR. COLOMBO:* Yes.

*THE COURT:* Exactly. That's the only difference. So I'm going to follow that calculation. The Government's at a minus 7, which seemed somewhat kind and generous. You're just a little bit higher.

*MR. COLOMBO:* Yes, your Honor, I am. And I'll tell you the reasons why.

*THE COURT:* Sure.

*MR. COLOMBO:* First, I think in looking at this, Ms. Moser was really considered, or should be somewhat considered a whistleblower. And the reason for that is

because prior to being aware that there was any criminal investigation, she was approached by plaintiffs' civil counsel in the civil case, which was a collected number of victims who had hired civil counsel to pursue a civil lawsuit against the GirlsDoPorn operation and the businesses.  And when they approached her, she agreed to cooperate with them.  And she confirmed what the -- the allegations were that that business was engaged in fraud and that they were concealing from the girls that these videos would be posted on the Internet; that she had become aware of that.

Now, this is prior to her being aware of any criminal investigation, prior to any benefit that she could incur on her own.  And when she agreed to cooperate, it was -- her boss, Mr. Pratt, was made aware of it and he attempted to dissuade her from doing so, first by offering her bonuses and an increase in pay.  And then when that didn't dissuade her from cooperating with plaintiffs' counsel, he then began a campaign of threats and intimidation against her, at some point breaking into her actual home to dissuade her from testifying.

And when she refused to not testify and continued to cooperate with plaintiffs' counsel, it's I think at that point that he really decided, well, this isn't going to go well, and he decided to disappear.  So I think that

she deserves a tremendous amount of credit for coming forward at a time prior to even knowing about any criminal investigation and realizing that she needs to be a part of exposing this.  And she testified --

THE COURT:  Let me stop for just a second.

We do have people online, correct?

THE CLERK:  We do, your Honor.  They're logging on.

THE COURT:  We have a dedicated line that we have some people, some victims I believe, listening in.  So if you hear that electronic noise, that's what it is.

I'm sorry to interrupt you, Mr. Colombo.

MR. COLOMBO:  No, that's okay.

THE COURT:  Go ahead.

MR. COLOMBO:  Thank you, your Honor.

So she testified under oath at the civil -- during the civil trial.  She was subject to cross-examination by defense counsel, of course, during this period of time, and she -- she said exactly what she had learned during the course of the conspiracy, and that was that they were engaged in fraud.

And she did so to, I think, the betterment of the victims who had filed that lawsuit because they ultimately prevailed.  And much of -- or some -- I think part of the decision that allowed them to prevail was -- cited in the

Court's decision was Ms. Moser's testimony.  And she did this all to her own detriment, admitting that she engaged in, you know, or became aware of this.

So I don't know how much of the original indictment the Government -- was based upon Ms. Moser's testimony that they were aware of under oath and had access to prior to the indictment.  I don't know.  I would imagine it did play a role in not only indicting this case but also in indicting Ms. Moser herself.  So I think that's something to consider.  I think that's sort of a super-acceptance of responsibility that we don't see is that somebody on their own, even before they're confronted by Government counsel, by investigators, comes to the realization this was wrong and then has the courage to come forward and acknowledge that, despite the retaliation against her.

So I think that that's not something that the Government's 5K motion acknowledges extensively.  I think it is something that the Court can take into account even if it doesn't relate to substantial assistance.

In addition, your Honor, I make this point -- and I think this is very important in terms of evaluating the substantial assistance.  You can evaluate and the Government can evaluate what Ms. Moser did to help the Government that warrants that minus 7 levels, but there's

also a consideration that the Court has to make, and the Government did not include this, is what Ms. Moser did not do during her cooperation.  She never lied about her role in the offense.  She never exaggerated to curry favor or to blame other people.

And for over six years she was dependable.  She lived her life in a way that would not detract from her credibility if she was ever called as a witness, as she agreed to, against the other defendants in the case.  And she maintained that dependability and credibility for six and a half years, and not doing anything during that period of time because she knew that, at some point, one of the other defendants might come to trial and she was committed to testifying against them.

And I think that's something that the Court can take into account when evaluating how somebody conducts themselves during the course of their cooperation.  And, again, this was all under -- you know, continuing to cooperate was all under, I think, the risk of retaliation.  She knew that Mr. Pratt was still out there during the period of his -- when he fled.  He still had access to finances.  He was still calling other people and inquiring about Ms. Moser and what she was doing.  He was still running websites, from what my understanding was, during this period of time.  So it's a real fear that she had

moving forward with the cooperation.

And I think that those are all things that the Court can take into account, and that's why I, in my evaluation of it, thought an 11 was a more appropriate number than the 7, ultimately what the Government requested. And so I think there is justification. If the Court isn't willing to apply those -- those mitigating factors for a greater substantial assistance reduction, I think the Court can do that with regard to a variance. And that's what I'd like to turn to, your Honor, with regard to the 3553(a) factors.

THE COURT: Sure.

MR. COLOMBO: The Government doesn't leave any room for a variance in this particular case, and I think that there are -- there is mitigating circumstances here that would warrant a non-custodial sentence as requested.

In looking at the nature and circumstances of the offense first, I can't deny that this was -- this was horrible. I mean, as your Honor knows, your Honor has sat through countless -- I've read the victim impact statements from the previous sentencings. And Ms. Moser demanded that I could provide them to her so she could read the transcripts of that because she wanted to educate herself on what these women really went through and how she played a role in that. And given her mental health

issues, I was very reticent to provide her with that, but she was insistent and it got to the point where I couldn't deny her access to them anymore, and I provided her with the transcripts that were publicly filed so that she could do that.

But in looking at the nature and circumstances of the offense, your Honor, it is very serious.  But all parties agree, the government, probation, and defense, that Ms. Moser's role in the offense was minimal.  She was a salaried employee.  She played a clerical role.  And while I know many of the girls that she dealt with, that she drove --

(Interruption in proceedings.)

*MR. COLOMBO:*  -- that they feel betrayed by her; that her demeanor, I guess, led them to feel more comfortable because a woman was -- was there, you know, to pick them up and drop them off and to assist them during this process and the filming.  And that's unfortunate, and Ms. Moser recognizes that.  But everyone agrees that her role in the offense was minimal.

As I mentioned earlier, and I don't want to go through this again, but in looking at the nature and circumstances of the offense, even prior to the offense, she agreed to provide truthful testimony and -- and expose the fraud that was being engaged in.  And, upon arrest,

ultimately her cooperation was immediate.  She didn't hesitate whatsoever after indictment.  She cooperated immediately.

In looking at her history and characteristics your Honor, I think her life is -- has been rather traumatic.  She suffered abuse at the hands of her father, physically, sexually, mentally.  And I can't imagine what that, you know, does to an individual that the person that they're supposed to trust most impacts them in some way.  That has clearly had some lifelong impact on her.

Now, this is no excuse for her conduct.  However, I think it does explain how she was willing to answer the Craigslist ad and be employed by this operation that she knew was engaging in adult filming, and why she would have been okay with that.  And of course she thought it was legitimate but, over the course of time, came to learn that it was -- they were engaging in the fraud.

But in looking at that, she in addition at a very young age suffered the tragic loss of her husband who died while serving as an Army Ranger in Afghanistan in the Middle East.  It's a very -- I don't know that she's ever really been able to recover from that and reestablish relationships in a way that other people would.

But she clearly has had lifelong mental health challenges that are serious, ongoing, and that's the

reason why I attached that lengthy amicus brief to explain that it's not just defense counsel who's advising the courts that the BOP is not in a position to treat people that have serious -- serious physical/mental health issues.  It's actually the BOP employees themselves at the highest levels who are saying we cannot adequately treat these individuals and it's overwhelming to us, and people are not getting the treatment that is needed.

And so that is something I think that the Court should take into account when putting that burden on the Bureau of the Prisons and also putting Ms. Moser at risk of not getting the treatment that -- that she needs. Because certainly I don't think the Bureau of the Prisons wants her, from looking at that amicus brief, given the serious mental health and physical health challenges treatment they would have to provide.  So and it's these -- you know, they're documented and verified it's not performative.  These issues, both mental and physical are real.

Over the last -- and Ms. Moser has been on bond now six years and two months, a little over six years and two months.  That's a long time for somebody to be on pretrial release.  And during that period of time, she's had no issues.  Not one advisal to the Court of any issues.  I think that's among the rarest of performance on

pretrial release.  And she's struggled, I think, to maintain stable employment and stable housing because she really, as a result of this offense and the media surrounding it, has -- has had a stigma.  And that will never leave her.  She's been marked by this, and so individuals have, you know, refused to hire her.  Individuals, if they do hire her, they then think they can take advantage of her.  And then other individuals who have hired her have come to learn after her involvement in this case and have fired her without explanation.

She's had all of her bank accounts closed as a result of this.  So it's difficult for her to maintain stable housing, stable employment, and she's really struggled, I think, to do so over the last six and a half years.  And to put her in custody now I think will retard any of the progress that she's made.

And, really, when she is released from custody, I don't think that she has anything to come back to.  She's really alone.  She's been abandoned by family, friends, everyone.  Many people have turned their back on her as a result of her involvement in this case, and so she's had these collateral consequences that are severe, serious, and -- and are likely to be lifelong.  And, unfortunately, it is as a result of her own decisions, but she acknowledges that and she's done everything that she can

over the last six and a half years to -- to make amends for that.

Now, in looking at the need for just punishment and the respect for the law, certainly the Supreme Court agrees that a probationary sentence is punishment, and the Court to punish somebody doesn't need to actually place them in custody. I mean, she's had her life supervised and reviewed for the last six and a half years, and we're recommending a five-year probationary period with a significant amount of community service which will act as also a punishment because she will be under the review of probation and subject to the Court if she doesn't comply -- for incarceration if she doesn't comply with all of the conditions of her release. So now this is a -- you know, looking in five years, this is an 11-year or more process. I think that that is substantial punishment.

When we get to deterrence, and I think this is always the difficult challenge that I think the Court has in terms of balancing rehabilitation with punishment with -- with deterrence and imposing a sentence that is sufficient but not greater than necessary.

In this case I think specific deterrence has already been achieved. I mean, Ms. Moser sits here today six and a half years later, and she's done nothing but positive things and hasn't engaged in any similar conduct

that would give the Court any indication that she is either likely to be a recidivist or likely to be a danger to the public.  So I think specific deterrence has absolutely been achieved through pretrial release.

General deterrence, I also think that that's been achieved.  And that's been achieved I think in the sentences -- the severe sentences that your Honor has imposed on the other four defendants that appeared before your Honor.  Your Honor imposed a total, among those four defendants, of 780 months' custody.  Mr. Pratt was -- was sentenced to, as your Honor knows, 324 months; Mr. Wolfe, 168 months; Mr. Garcia, 240 months; and Mr. Gyi, 48 months.  Now, Ms. Nored, who had been charged initially, the case against her was dismissed, but she sort of played a similar but somewhat lesser of a role to Ms. Moser during the course of the conspiracy.  But those were very serious sentences imposed by your Honor.

I believe your Honor exceeded in every -- in all of those cases, the sentence being recommended by the Government and imposed a more severe sentence than the Government was recommending in those cases.  And they are very severe sentences, and I think that those sentences act as general deterrence.  And I don't think imposing custody here for Ms. Moser furthers that message in any significant way, I think, when balancing Ms. Moser's

history and characteristics, the mental and physical health, her cooperation, her -- her cooperation even before being investigated in this particular case.  So on balance, I think general deterrence has been fulfilled.

And finally, your Honor, in protecting the public, I think Ms. Moser is rehabilitated.  I think to put her in custody now, as I mentioned, retards the progress that she's made over the last six and a half years.  And she really is alone.  I think the only person she's had to communicate with in any significant way was me, unfortunately, her counsel.  And she has -- you know, has suffered from this.

There's no need put her in custody to protect the public at this point, and I think it would actually be counterproductive.  Because if she is put in custody, her stability is so tenuous that, once she's released, I don't know where she's going to go.  And, ultimately, I think she is probably going to be homeless because she doesn't have any safety net or the ability to quickly and easily gain employment to -- to set herself on the right path.

And so while I -- while I understand, and I know that Ms. Moser does, that the women in this case suffered, there's no question about that, and I think she sincerely regrets her involvement in this.  She sincerely regrets the impact it's had on the other individuals.  But at this

point, your Honor, overall, I think the sentence requested is sufficient but not greater than necessary to achieve all of the goals required by sentencing.

Ms. Moser did provide to me last night two statements, one of which was her addressing -- address to the Court; the other was her address to the victims in the case.  I talked to her about it this morning.  She said that she doesn't believe that she could read it herself. I am happy to provide your Honor with a copy of it, or if your Honor wants me to read it into the record, I can do that as well.

THE COURT:  Okay.  Let me just talk to you for a second.

Ms. Moser, when counsel's finished, I would normally -- you can remain seated if you're more comfortable, ma'am.  I would normally ask you if you wanted to address the Court and tell me anything you'd like to tell me.  If you want Mr. Colombo to handle it, I'm happy and willing to let him do that, but I'd like to know that from you, ma'am.

THE DEFENDANT:  I don't know if I'm able to speak.

THE COURT:  Okay.  So you'd like Mr. Colombo to handle it?

THE DEFENDANT:  I think so, yes.

THE COURT:  Okay.  Thank you.  Thank you.  And that's fine with the Court.  You may be seated, ma'am.

Mr. Colombo, I'll leave it up to you whether you read it or provide it to the Government and the Court.

MR. COLOMBO:  I have provided a copy to Government counsel.  I am prepared to provide it to the Court.

THE COURT:  How long is it?

MR. COLOMBO:  Her personal statement is two pages, your Honor, and the statement to the victims is a half page.

THE COURT:  Why don't you put them in the record because there are people here observing, sir.

MR. COLOMBO:  You'd like me to read it into the record?

THE COURT:  I think so.

MR. COLOMBO:  Okay.  I'll try to go as slow as I can for the court reporter, your Honor.

THE COURT:  Exactly.  I mean, you can give me a copy afterwards, but I think it's important for everybody to hear what is written.

MR. COLOMBO:  Okay.  "Your Honor" --

THE COURT:  Now, this is the address from Ms. Moser to the Court?

MR. COLOMBO:  Yes.  Yes.

*THE COURT:*  Okay.  Go ahead.

*MR. COLOMBO:*  "Your Honor, my small-town upbringing in Southern Pines, North Carolina, made me very naïve and trusting.  I have always followed authority be it teachers, the Mormon church and family and in San Diego with employers, medical doctors, and attorneys.  I too responded to a Craigslist ad in 2015 and was hired by Matthew Wolfe as an administrative assistant with the belief that we made ethical adult content.

"I made very clear then I was fine with it as long as I was not asked or pressured into doing it.  He promised to teach me accounting and QuickBooks.  I have stood on my truth the version of events seen through my eyes since day one, throughout the civil trials in 2018 and even today.  I do believe that part of the success of the civil trial for the women can be attributed to my truthful testimony.  Their attorney Brian Holmes can confirm this.

"Michael Pratt knew that I was not a liar.  He trusted me with money because I was a good egg in his view.  I could not be or use the fake name he wished me to use, Anna, more than a week.  I could not claim to be an Uber or Lyft driver, and I certainly wasn't going to lie under oath.  I believe the time that I gave my deposition was the time he chose to flee the country.  I refused

Pratt's attempts to buy my silence.  I never accepted bonuses.  I saved each of the women's texts, even when I was pressured to delete everything.  I showed no fear when threats were attempted to deter me from testifying.  Aaron Sadock and Michael Pratt's veil of lies extended far beyond the women that were filmed.  I had to report a coworker for harassment that went on there.  I fell off the wagon during my tenure at GDP and did get a DUI.  My employment with the company changed me.

"Since being charged in October of 2019, I have been closed off.  I live in isolation.  I have worked very hard to become small, unseen, to require less space.  I have been fearful of being recognized by the media or getting Michael Pratt's promised retaliation.  I look over my shoulder constantly.  I keep many cameras around my home and car as media articles suggest that I was a narc and whistleblower, while in the same article suggesting that GDP company may be affiliated with the cartel.  That link is terrifying -- terrifying living so close to Mexico.

"I have deleted all of my social media profiles after cruel and tormenting comments began storming in. These criminal charges have cost a beloved relationship to somebody I had hoped I would one day marry.  His sibling said I would be an embarrassment to their family name and

their father who was a retired judge.  I have been pained and alone since.  My mental health battle has never been heavier.  I have tried every legal mental health treatment option to make it lighter.  I'm only alive because of my dog and my dog alone.  I had to report one of the defendants, Matthew Wolfe, to stop his many calls from prison over the summer, which was reported to Pretrial Services.

"All of my relationships end.  No person with an ounce of respect would be involved with me or this scandal.  I am disregarded, thrown away.  And no matter what my actions and my heart have proven and shown, I am fired suddenly -- four times this year.  Bank of America has closed all of my accounts, as I was a customer for over 20 years, and Capital One has as well.  I am here alone today.  My friend and neighbor of three years that agreed to drive me here canceled and ghosted me suddenly last week, and she wanted her character reference letter rescinded.  That's the seventh time that a situation like this has happened.  It doesn't hurt any less each time.

"When my attorney asked for character letters, I originally told him no, but the truth is no one of value will stand with me.  I don't know what quality of life I am to create with this and there is now this life sentence permanently on my name.  I have been fortunate to maintain

part-time employment with an amazing company.  However, finding full-time employment to pair has been very challenging.  Many job offers have been rescinded or I am hired by deviants with bad intentions.  One employer groped me and tried to recruit me for sexual engagements to satisfy he and his wife.  He thought porn-related charges would make me a wild party woman.  When I refused his advances I was terminated.  I tried to retain counsel to get civil representation for this, but I could not.  I had recorded irrefutable evidence of what happened, but I could not obtain anyone to represent me.

"When provided, I listened to the victim impact statements over and over.  I didn't miss one word.  It was very difficult, but I forced myself to take it all in to absorb all of it.  It was important to me to understand the full nature of events that occurred.  Not knowing all of the facts and details is what failed me before.  I felt stunned, disgusted, gullible.  Their words challenged everything that Aaron Sadock and Michael Pratt had covered up so many years.  It made me physically sick and I had to listen to them in small chunks spread over time, but I retained it all.

"Last month I am four years sober.  I am no threat to society unless you don't want me to admire your dog.  The last six and a half years I've been serving

pretrial release without an infraction.  Custodial time would mean that I lose my home, my job, and my geriatric dog in her final years when she needs me the most.  I do not want to be separated from my dog.  She's all that I have.  I'll serve more time in custody to avoid losing her.

"I've battled with insomnia since my husband was killed in 2007, and I was recently approved by insurance and accepted into a three-month sleep study program beginning in January.  It was a 10-month wait list.  Please consider that the Bureau of the Prisons does not offer this medication, and my condition would go untreated and I would suffer.

"I did a Google search and a ChatGPT hit on what a letter to the sentencing judge should look like.  While I know that my letter won't look like most, I apologize.  It is not a form of disrespect to you.  Please take no offense with my delivery.  I hope that you find my letter to be real; mine is sincere.  I do not think I deserve to escape the consequences.  I wanted to show you that I have been suffering them all along.  Please allow me to remain in custody [sic].  You will not regret it."  And it's signed by Ms. Moser.

*THE COURT:*  Okay.  Thank you, Ms. Moser, for those comments.  They're appreciated.

Okay.  Now you have another thing to read?

MR. COLOMBO:  Yes.  And this is -- this is directed directly to -- a letter directed directly to the victims in the case.  And it's addressed to the women:  "I had your transcribed impact statements read aloud into my headphone devices with sound many times.  I want you to know that I heard you.  I want you to know that I listened, that I learned so much.  You are all so brave to share your stories, and it was devastating to take in.  Such admirable strength you've shown.

I feel disgusted, shameful, and foolish.  The veil of lies did not only extend to you all.  Learning of the abuse and assaults is everything I stand against.  I have personally experienced that trauma and wouldn't wish that on anyone.  I really hope that one day you feel clean.  I am certain that your personal sense of safety, trust, and peace will never be the same.  And in ways I cannot fully comprehend, knowing that I contributed to that will stay with me and it should.  You deserve to be safe, respected, and treated with dignity.  I failed to uphold that, and I am truly sorry I failed you."

And it's signed by Ms. Moser.

THE COURT:  Okay.  Thank you.  Is that everything from the defense, Mr. Colombo?

MR. COLOMBO:  Yes, your Honor.  Thank you.

THE COURT:  Okay.  Very good.

On behalf of the Government?

*MS. FOSTER:*  Your Honor, I have a brief statement.  My understanding is -- and I provided -- I filed this last night, the victim list for the sentencing hearing, there was one woman.  My understanding is that she has not appeared.

That said, I have received two victim impact statements from two verified victims, and they have asked that I read those two victim impact statements.

*THE COURT:*  Are those the ones that I have copies of?

*MS. FOSTER:*  They are not, your Honor.  They are two additional --

*THE COURT:*  Two additional ones?  That's fine. You certainly may.

*MS. FOSTER:*  So let me start by addressing some of the things that counsel raised, and then read -- read in the two statements, if that's okay with the Court.

*THE COURT:*  That's fine.  Thank you, Ms. Foster.

*MS. FOSTER:*  So everything that defense counsel lists was considered by the Government in its recommendation.  It recommended that minus 7 for substantial assistance because she testified in the civil trial, because she cooperated with the Government, because

she was truthful -- because that's the expectation when you are cooperating with the Government is that you're going to be truthful -- because she led an impressive life without incident during this period of six and a half years when she was out on supervised release, which is how it is that the Government came to this minus 7, which, as the Court points out, is a big deal, especially when we're talking about the case where the numbers are already fairly low.

The other thing that defense counsel listed was the mitigation, the mental health issues that Ms. Moser has suffered.  And although I don't question but that those things are true, that is why the Government has taken into consideration that minus 4 that takes into consideration her mental health issues.

And then to the point of her role in all of this. Yes, she was an accountant.  And, yes, she drove these women back and forth to the hotels.  And that is why the United States has recommended that minus 4 for minimal role.  So all of the things that defense counsel has requested as to why it is that the Court should grant some leniency here have already been taken into consideration in the Government's recommendation at sentencing.  And that is how we do come to that 24 months.

What I would say is as to the civil trial,

Ms. Moser did testify.  That being said, it is not Ms. Moser that broke that case wide open.  What broke that case wide open was the victims' testimony over and over again.  And the idea that it was Ms. Moser that made that happen is just -- it's not correct, and it's not fair.

At this time, unless the Court has any questions, I'm happy to read into the record the two statements by the two additional victims who have filed statements.

*THE COURT:*  Certainly.  Go ahead.

*MS. FOSTER:*  So as to the first one:  "Your Honor, Valorie Moser was the one who picked me up from the airport and drove me to the hotel where I was trafficked. Her role was to make us women feel more comfortable because women often trust other women.  When I got into her car, she could sense I was nervous and reassured me the entire way to the hotel that everything would be okay and every other girl has a great time.  She gained my trust.  I trusted that everything would be okay because how could a woman allow something like this to happen to another woman?

"She checked me into the hotel and again reassured me everything would be great and they would be back later.  She took a hotel key for herself and left. Later that night, they opened my hotel room door and this nightmare began.  She knew what she was doing and played a

major role in the scheme.  She wasn't just a bookkeeper that didn't know what was happening; she was a willing participant.  She assured me everything would be okay when she knew it wouldn't, and she deserves to be sentenced to jail.  Thank you for allowing me to speak, your Honor."

And then apologies, your Honor.  I just got this and therefore I'm going to read this on my phone.

And the second victim impact statement reads: "Your Honor, my name is Nitzia, and I want to be heard about the lasting harm caused to me by Valorie Moser.  Valorie was someone I was told to trust.  She was entrusted with picking me up from the airport and helping me feel safe and settled during a time when I was vulnerable and unsure of what was ahead.

"Instead of protecting me, she used that trust as a weapon.  She presented herself as a guide and a source of reassurance while knowingly placing me in danger.  Through psychological manipulation and deception, Valorie made us believe that we were going to be okay.  She exploited our fear, confusion, and vulnerability to control our decisions and lower our defenses.

"As a woman, someone who understood what safety and solidarity should mean, she broke every unspoken code of care and protection.  That betrayal has left a deep and permanent mark on me.  Valorie's actions directly led to

my being turned over into a situation where I was raped and subjected to severe trauma.  The impact of that decision did not end in that moment.  I have lived with the consequences for years, emotionally, psychologically, and physically.  The fear, the same, the hypervigilance, and the loss of trust in others have reshaped my life in ways that are difficult to put into words.

"What has been most devastating is the knowledge that this was all preventable.  Valorie knew what she was doing.  She was not confused or mistaken.  She actively manipulated and delivered us into harm.  The torment that followed was not accidental; it was the result of her choices.  I continued to struggle with the aftermath of her actions.  I am still processing the trauma, still rebuilding my sense of safety, and still grappling with the disbelief that someone who played such a central role in this has not yet faced consequences proportionate to the damage she caused.

"I am asking the Court to fully consider the severity and long-term impact of Valorie Moser's actions.  Accountability matters, not only for my feeling but to ensure that she cannot ever again abuse the trust and engage -- endanger others the way she did to me.  Thank you for allowing me to be heard."

Your Honor, briefly, the issue here is that these

women trusted Ms. Moser.  That Ms. Moser picked them up and drove them to the hotel and then picked them up and drove them back to the airport.  Ms. Moser knew that there was a problem because she got phone calls, along with Mr. Garcia, Mr. Pratt, and Mr. Wolfe.  And then she chose to block those people so that she didn't have to deal with the aftermath of what had happened to them.  And that is why the Government is recommending 24 months in this case.

THE COURT:  Before you sit down.

MS. FOSTER:  Yes, ma'am?

THE COURT:  You're requesting five years of supervision.  Is it five years or three years under 371, which is I think what she pled to?

MS. FOSTER:  My apologies, your Honor.  It should be three years.

THE COURT:  Should be three years.  That's what I thought.

MS. FOSTER:  Yes.

THE COURT:  Okay.  Thank you.

MR. COLOMBO:  Your Honor --

THE COURT:  Let me ask probation.

PROBATION OFFICER:  Nothing additional.  Thank you.

THE COURT:  Okay.  Go ahead.

MR. COLOMBO:  Your Honor, if I might just briefly

respond.

THE COURT:  Briefly.

MR. COLOMBO:  Two things:  To the Government's point with regard to the civil lawsuit.  Certainly, the victims coming forward is -- was the catalyst for that. But of I think immeasurable support was the corroboration that Ms. Moser provided as an insider, as an employee that is corroborating their -- their testimony, their experience.  And so as you know, the corroboration is invaluable.  And so while, yes, what broke the dam as the Government said is these women coming forward, what helped to corroborate their stories was Ms. Moser, an insider, who decided to tell the truth.

And with regard to the allegation, I want to be very clear because I don't want the Court to be misled in this:  Ms. Moser was not aware, and the Government doesn't have any evidence that points to this, that Ms. Moser was aware that these girls were being sexually assaulted or raped.  That has never been established.  Yes, there were complaints after, and she was told if somebody's calling to block the calls.  That is true.  But in real time she was not aware during the course of her employment that these things were happening.  They were not told directly to her after they left -- you know, when she drove them to the airport.  There were none of those reports to her

where she would have been aware in real time, and I think that's an important consideration.

THE COURT:  Let me say this:  Based on everything I know about this case, she was aware that the statements and assurances that she provided to these women were false.

MR. COLOMBO:  Yes.  I'm not going -- I don't dispute that.

THE COURT:  You're not saying that?

MR. COLOMBO:  Yes, but the statements --

THE COURT:  But you're saying she didn't know the extent of the sexual assaults that were going on?

MR. COLOMBO:  Correct.  Yes.

THE COURT:  Well, if the Government disagrees with that, I'm sure they'll tell me.

Okay.  Anything else?

MR. COLOMBO:  No, your Honor.  Thank you.

THE COURT:  Okay.  Ms. Foster, is that -- I mean, she knew that the representations to the women were false?

MS. FOSTER:  That's correct.  She knew that the representations that these are going on one DVD, and it's just going to Australia, that all of those representations were false.  She knew that these videos were going to get posted onto GirlsDoPorn and that GirlsDoPorn had links on Pornhub.  So she knew all of that.

THE COURT:  Okay.  Well, I have adequate information to exercise sentencing discretion. Mr. Colombo and Ms. Moser, if you'd approach the podium.

Are you able to come stand at the podium, ma'am, or do you need to remain seated?

THE DEFENDANT:  No, I'm good.  Thank you.

THE COURT:  As I said, I have adequate information to exercise sentencing discretion.  And I'll begin, Ms. Moser, by making the necessary guideline findings and explaining as I go through this.  I do believe, and I'm looking to the Government, this is the last of the defendants in this overall conspiracy.

MS. FOSTER:  Your Honor, there actually is one more defendant.  His name is Douglas Wiederhold.  He was charged separately, and his sentencing is in January.  But she is the last defendant on the 19-cr-4488.

THE COURT:  Okay.  There is one that is separate. That's correct.  Thank you for reminding me.

In any event, Ms. Moser, the base offense level for what occurred here is a 34, but I agree with everybody that you had a minimal role in the totality of what happened here, and that's a four-point reduction, resulting in an adjusted offense level of 30.  You've also accepted responsibility, and that's a three-point reduction, taking me to a total offense level of 27.

You have two criminal history points, and that places you in Criminal History Category II.  You get a four-point reduction for mental health, and at this point I'm going to give you a seven-point reduction for your cooperation and efforts in that regard, which takes me down to an offense level of 16, Criminal History Category II, and that's a range of 24 to 30 months.

So here's the question, Ms. Moser.  Are you in that guideline range or should I vary downward?  This is what I consider:  I consider everything about you, your history, your circumstance; I consider everything about the offense; I consider protection of the public, promoting respect for the law, general and specific deterrence, and sentencing disparities.

When I consider all of that, ma'am, we've already mentioned this, but while you had a minimal role, you had -- it sounds contradictory, but you had a minimal role but you played an important part in this process.  You picked up the women.  You provided them assurances and comfort, if you will.  And much of that comfort was false assurances, and assurances that you knew to be false.  So to that extent the Court does believe you were involved in the fraud and took part in the fraud, Ms. Moser.

So for those reasons, I'm not able to exercise the Court's -- I'm not willing.  I shouldn't say "able."

I'm able but I'm not willing to exercise the Court's discretion and vary downward.  I'm going to impose the low end of this guideline range of 24 months in the custody of the Bureau of the Prisons.  I think that's sufficient but not greater than what's necessary, given everything I know about you and this process that you were involved in and the conspiracy and the crime.

It's going to be followed though by three years of supervision.  And during those three years of supervision, if you violate any law, state, federal or local, you could be brought back before the Court.  All the standard and mandatory conditions apply.  You've reviewed those, Mr. Colombo, with your client?

*MR. COLOMBO:*  Yes, your Honor.  It's in the presentence investigation report.

*THE COURT:*  Okay.  But the following special conditions apply:  And the first is that a program of mental health treatment, as directed by probation.  You're to take all medications prescribed by a physician, not discontinue unless that's recommended.

Further, I'll release information to a treatment provider.  You might be required to help pay for that, but only if you have the ability to do so.

Second condition, abstain from any use of alcohol.

Third condition, report all vehicles that you own or operate.

And fourth condition is a Fourth Amendment waiver:  That you submit your person, property, home, vehicle, papers, computers, data storage devices to a search conducted by probation, provided the search is done at a reasonable time, in a reasonable manner, based upon a reasonable suspicion of contraband or evidence that you violated a condition of your release.

The final condition is to just release personal and business financial records as requested by probation. No fine will be imposed.  The $100 special assessment can be worked off while you're in custody.

Mr. Colombo, are you asking for a future self-surrender date?

*MR. COLOMBO:*  Yes, your Honor.  I would ask for eight weeks so that Ms. Moser can be designated and time to put her affairs --

*THE COURT:*  Are you asking for a housing designation?

*MR. COLOMBO:*  I do, your Honor.  I do think that placement in a medical facility --

*THE COURT:*  Okay.

*MR. COLOMBO:*  -- within the Bureau of the Prisons is the most appropriate.  There are four in the United

States.

THE COURT:  Right.  Did you want to pick one?

MR. COLOMBO:  I would think Butner, North Carolina, would probably be --

THE COURT:  No?

MR. COLOMBO:  Okay.  No, she does not want Butner.

THE COURT:  Okay.  Not Butner.

MR. COLOMBO:  Maybe to ensure that it is -- that she is placed in a medical facility that we don't limit it geographically because there's --

THE COURT:  Okay.  Is there an objection to a future self-surrender date, Ms. Foster?

MS. FOSTER:  No, your Honor.

THE COURT:  Okay.  So we'll give you a date six to eight weeks out.  We will request housing in a medical facility that can take care of medical needs and psychiatric needs.  And, okay, is her surety here by any chance?

MR. COLOMBO:  No.  No.

THE COURT:  So by mid next week, provide me an acknowledgment from the surety that they're willing to stay in that capacity pending her self-surrender.  And Adrianna will now set those dates.

Go ahead.

THE CLERK:  Self-surrender January 30th at 12:00 p.m. and a status hearing is set for February 6th at 9:00 a.m.

THE DEFENDANT:  Thank you, your Honor.

THE CLERK:  Appeal rights, your Honor.

THE COURT:  Oh, thank you.

In your plea agreement on pages 11 and 12, Ms. Moser, you gave up your right to appeal or collaterally attack the judgment in this criminal case and the sentence that was just imposed.

Do you understand that, ma'am?

THE DEFENDANT:  I did when?

THE COURT:  I'm sorry?

THE DEFENDANT:  When?

MR. COLOMBO:  She's asking if you've waived appeal.

THE COURT:  Do you understand that in your plea agreement on this case you gave up your right to appeal the judgment in this case and the sentence?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  Okay.  We're now going to give you, Ms. Moser, copies of the conditions that have been imposed.  They're printed for you, and you should keep that paperwork.

THE DEFENDANT:  Thank you.

THE COURT:  Is there anything that the Court has not covered?  Let me ask probation.  Let me ask you, Mr. Colombo.  Let me ask you, Ms. Foster.

MS. FOSTER:  No, your Honor.  Not from the United States.

MR. COLOMBO:  No, your Honor.

PROBATION OFFICER:  No, your Honor.

THE COURT:  Okay.  Adrianna?

THE CLERK:  There's an underlying count.

THE COURT:  Oh, apparently there's an underlying count that should be dismissed.

MS. FOSTER:  Your Honor, I think she pled guilty to the one count in the information, which is the 371 count.  But to the extent that there are any counts that are remaining as to Ms. Moser, the United States would move to dismiss them.

THE COURT:  Okay.  And that motion to dismiss would be granted.  We'll double-check.  Thank you.  So we've concluded everything?

MR. COLOMBO:  Yes, your Honor.

THE COURT:  Okay.  Thank you.  Thank you.  We'll be in recess.

MR. COLOMBO:  Thank you, your Honor.

THE DEFENDANT:  Thank you.

(Proceedings concluded at 11:37 a.m.)

*C E R T I F I C A T E*


    I, Stephanie Whitehead, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court; that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on December 12, 2025; and that the format used complies with the rules and requirements of the United States Judicial Conference.


    Dated:  January 13, 2026


    *s/ STEPHANIE WHITEHEAD*


Stephanie Whitehead, CSR 10093
U.S. Official Court Reporter